**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: April 29, 2010**

_Craig A. Gargotta_

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 08-12442-CAG |
| | § | CASE NO. 08-12443-CAG |
| INTROGEN THERAPEUTICS, INC., | § | |
| INTROGEN TECHNICAL SERVICES, INC., | § | CHAPTER 11 |
| | § | |
| Debtors. | § | JOINTLY ADMINISTERED UNDER |
| | § | CASE NO. 08-12442-CAG |
| | **§** | |

## MEMORANDUM OPINION CONFIRMING
## DEBTOR'S PLAN OF REORGANIZATION

Introgen Therapeutics, Inc. and Introgen Technical Services, Inc. (together "Debtors") submitted their Amended Disclosure Statement on July 24, 2009, and their Modified Plan of Reorganization on October 7, 2009. Classes 1, 2, and 4 voted to accept the Plan, while Class 3 rejected the Plan and joined the United States Trustee's motion to convert the case to Chapter 7. A hearing was held on October 8, 2009 to consider the Debtors' Modified Plan of

Reorganization. At trial, representatives for Debtors appeared, as did representatives for several of Debtors' creditors – Wilson Sonsini Goodrich & Rosati, P.C. ("Wilson Sonsini"), David Nance, Wilson & Varner, Westat, Inc. (collectively referred to as "Creditors"), and the United States Trustee – to determine whether Debtors' Plan could be approved. All creditors present at the hearing, except for the United States Trustee, are members of Class 3 – Allowed General Unsecured Claims. After the trial, several matters were taken under advisement and parties were given an opportunity to submit briefs in support of their position. Creditors' main contentions are that the Plan does not have an impaired accepting class, that substantive consolidation is improper for the Debtors, and that the Plan violates the absolute priority rule.

The Court has reviewed the briefs of Debtors and the various creditors and has considered the arguments and evidence of counsel. Based on the foregoing, the Court finds that the Plan as modified is confirmable and satisfies all confirmation requirements under 11 U.S.C. § 1129 for the reasons stated below.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(L) and (O) on which this Court can enter a final judgment. This matter is referred to the Court under the District's Standing Order of Reference. Venue is proper under 28 U.S.C. §§ 1408 and 1409. The following represents the Court's findings of fact and conclusions of law made pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

### BACKGROUND OF DEBTOR

Prior to filing for bankruptcy, Introgen Therapeutics, Inc. ("Introgen") was a biopharmaceutical company focused on the discovery, development, and commercialization of targeted molecular therapies for the treatment of cancer and other diseases. Introgen developed

2

product candidates to treat a wide range of cancers using various techniques. Introgen's development program included five clinical-stage product candidates in various phases of development. In June 2008, Introgen submitted a Biologics License Application to the U.S. Food and Drug Administration ("FDA") requesting marketing approval for one of their product candidates. Also in June, a non-debtor European subsidiary of Introgen, Gendux Molecular Limited, submitted a Marketing Authorization Application to the European Medicines Evaluation Agency for the same indication. In addition to developing treatments, at the time of filing, Introgen controlled a broad intellectual property portfolio which included more than 400 patent applications and issued patents for a variety of molecular therapy technologies and adenovirus production, purification, and formulation.

In June 2008, Introgen, in an effort to create further revenue, spun off its manufacturing facilities and formed Introgen Technical Services, Inc. ("ITS"), a wholly-owned subsidiary of Introgen. According to Introgen's 2008 Third Quarter 10-K, at the inception of ITS, Introgen anticipated that ITS would (1) assume responsibility for producing investigative materials for Introgen's clinical trials; (2) produce and provide Introgen commercial supplies of products for which Introgen may receive marketing approval from the appropriate regulatory agencies; and (3) pursue contract production, process development, and manufacturing services for third parties. (Debtor's Ex. 7-D, 25.) ITS assumed responsibility for overseeing and managing the resources used in Introgen's manufacturing activities, and employed and managed the personnel required to continue those processes. (*Id.*)

## CIRCUMSTANCES LEADING TO BANKRUPTCY

According to the Debtor's Amended Disclosure Statement, a 2009 regulatory setback before the FDA harmed the prospects for a speedy approval of Introgen's cancer drug, Advexin,

3

resulting in a liquidity crisis.  As a result of this setback, Debtors were unable to move forward with plans of marketing and selling the drug.  Continuing expenditures and significant operating losses precipitated the filing of the Debtors' bankruptcy cases.  The Debtors experienced a cash drain related mostly to, in the words of Debtors' first Disclosure Statement, attorneys' fees and an inefficient operating style.  (Doc. #292, p. 14.)

### POST-PETITION ACTIVITY OF THE DEBTORS

After considering the various options available to Debtors, the Debtors concluded that the best course of action for both creditors and holders of equity interests would be to engage in an orderly disposition of the Debtors' assets and to wind down the remaining affairs through a liquidating trust.  Throughout their bankruptcy cases, the Debtors continued to perform work in the ordinary course of business.  The Debtors also produced biological materials for two key customers, Advantageme, Inc. and the H. Lee Moffitt Cancer Center.

Pursuant to Debtors' decision to liquidate the assets, the significant events in Debtors' Chapter 11 proceedings have been the disposition of their assets.  On April 23, 2009, this Court approved the sale of certain contract manufacturing assets to Crucell Holland, B.V. ("Crucell").  Crucell purchased eight patent families from Introgen (the "Crucell Patents") for $425,000.  Additionally, Introgen retained a 35% share of all net license revenues, royalties, and proceeds received by Crucell and its affiliates, in connection with the licensing of the Crucell Patents to begin on May 15, 2009 and to last in perpetuity.

On April 27, 2009, this Court approved the sale of ITS' contract manufacturing business to Vivante GMP Solutions, Inc. ("Vivante"), an affiliate of Western General Holding Company.  On June 1, 2009, the Debtors and Vivante executed an asset purchase agreement under which Vivante agreed to pay $50,000 to Debtors and in exchange Debtors would receive, on a quarterly

basis, an amount equal to three percent (3%) of all gross revenues and proceeds received by Vivante derived from or arising from the purchased assets. Debtors will receive this 3% share until the earlier of June 1, 2014 or the day on which the Debtors' bankruptcy estates receive aggregate compensation in the amount of $5,000,000.

On October 8, 2009, this Court approved the asset purchase agreement between Debtors and Pope Investments II, LLC ("Pope"). The asset purchase agreement provided for Pope to purchase certain patents and related intellectual property rights, contracts, and remaining vials of Advexin and other personal property. As discussed below, the agreement provides for Pope to receive substantially all assets of Debtors left over after the sale to Vivante and Crucell. In exchange for these assets, Debtors are to receive $1,000,000 at closing and bonuses based on future net sales.[1]

### DEBTOR'S PLAN OF REORGANIZATION

The Debtors have proposed one plan for both entities, consolidating the assets and liabilities of both Introgen and ITS. The plan proposes the establishment of a Liquidating Trust at the time the Plan is confirmed, containing the assets of the Debtors from which the creditors will be paid pursuant to the Plan. The Trust will be overseen by a Liquidating Trustee as well as a Liquidating Trust Board consisting of one allowed priority claimant, one allowed unsecured claimant, and one allowed equity interest holder. The Board will have the right to advance reporting by the Liquidating Trustee, and to approve or disapprove proposed material transactions by the Liquidating Trust. The Plan itself proposes liquidating the Debtors' remaining assets and using the money from the sales of the assets and any retained interests in revenue streams to fund the Plan.

---

[1] Specifically, Debtors will receive $5 million when net sales exceed $50 million, an additional $5 million when net sales exceed $100 million, and an additional final $20 million payment when net sales exceed $500 million.

The Plan has four classes of creditors.  Class 1 consists of all Allowed Secured Claims.  The only Secured Claimant is General Electrical Capital Corporation ("GE").  The Debtors' Schedules reflect Secured Claims in the amount of $433,188, but Debtors and GE have agreed that GE's Secured Claim shall be reduced to $70,000 upon the sale of the Debtors' CMO business to Vivante.  The Creditors in Class 1 will be paid in full by the Plan.

Class 2 consists of all Priority Claims, totaling $490,115.45.  Class 2 will be paid the full amount of their claims.

Class 3 consists of all Allowed General Unsecured Claims. The Debtors' Schedules reflect Unsecured Claims in the amount of $4,434,914.21.  Debtors anticipate paying the General Unsecured Creditors in full over time by giving claim holders a beneficial interest in the Liquidating Trust, entitling them to receive their pro rata share of any cash distribution from the Liquidating Trust, in full satisfaction of their claim.

Class 4 consists of all Equity Interests.  If the Liquidating Trustee determines that there are sufficient funds available for a distribution to holders of Equity Interests after all Allowed General Unsecured Claims have been paid, the Liquidating Trustee shall file a motion asking the Bankruptcy Court to establish the Equity Interest Bar Date.  The plan specifically provides that there shall be no distribution under the Plan to Class 4 until after everyone in Classes 1, 2, and 3 have been paid in full.  On the Effective Date, all equity interests of the Debtors shall be cancelled, and holders of Allowed Equity Interests are to receive a beneficial interest in the Liquidating Trust entitling them to receive a pro rata share of any remaining cash distributions from the Liquidating Trust, solely to the extent that all interest holders in Classes 1, 2, and 3 have been paid in full.

The Plan also accounts for Administrative Claims and Tax Claims to be treated according to the relevant sections of the Bankruptcy Code.  At the time the Amended Disclosure Statement was filed, the Debtors had incurred $299,379.86 in Administrative Claims.

### SUMMARY OF TESTIMONY FROM OCTOBER 8, 2009

On October 8, 2009, a confirmation hearing was held to consider and act upon the Debtors' Plan of Reorganization and all objections filed by creditors.  Representatives for Debtors appeared, as did representatives for Creditors and the United States Trustees Office. Below is a summary of the testimony presented.

There were several matters presented at trial—the materiality of modifications to the Plan made by the Debtors, a motion to convert the case to Chapter 7 or, in the alternative, appoint a Chapter 11 trustee, an objection to the Plan based on concerns that the Plan violated 11 U.S.C. § 1129(b)(2), and the existence of an impaired accepting class as required in order to confirm a plan over the objection of a Creditor.[2]  During the hearing the former President and CEO of Introgen John David Enloe, and the Chief Restructuring Officer of the Debtors, Michael Ciesla, testified.

During his testimony, Enloe testified as to why he believed that there would be more value to the Creditors if the case remained in Chapter 11.  He testified that conversion to Chapter 7 would be a bad idea because creditors would be unable to get the full realization of some assets if the case were converted.  On cross examination, Enloe was asked his opinion as to whether allowing Ciesla to oversee the liquidation would be better or worse for creditors than a

---

[2] Additionally, several matters raised by Debtors were not heard that day.  Debtors had previously filed a motion to designate the ballots cast by Wilson Sonsini as being filed in bad faith and to set the ballot tally of creditors to their scheduled amount, or in the alterative, to the claim amount designed in their respective proofs of claim.  Debtors elected to go forward just on confirmation of the plan.

Chapter 7 Trustee.  Enloe testified that he did not know what a Chapter 7 Trustee would do, but stated that he believed Ciesla would be good at overseeing the liquidation.  On redirect, he testified on the importance of preserving patents in order to maintain their value.  He testified that if a patent portfolio was managed by an entity without sufficient assets to maintain the portfolio, the portfolio would likely get abandoned and its value would be substantially depleted.

After Enloe's testimony, the Debtors' Chief Restructuring Officer testified.  Ciesla first testified regarding his relevant experience to establish that he was qualified to testify about the skills required to efficiently track royalties.  He stated that ensuring an estate maximizes the amount it can get from its patents requires diligence and monitoring the numbers of sales.  He discussed his relevant skills, including that he is a licensed CPA with a solid finance and accounting background.  Having already made the determination that Ciesla should be Chief Restructuring Officer, as opposed to appointing a Trustee, this Court had already made the determination that Ciesla was qualified to monitor Debtors' patent portfolio.  When asked if the case should be converted to a Chapter 7, Ciesla testified that it should not—the costs of a Trustee would be much higher, and some of the royalty payments would be too nominal for a Trustee to pursue, and the estate would ultimately suffer.

Ciesla testified on the design of the Debtors' Plan.  He testified that he initially believed the Plan to be a non-controversial one, that all classes would be paid in order of priority, and that there would be no disparate treatment in any class.  He testified that the Plan was proposed in good faith, and there had been no payments made outside of the ordinary course of business without approval of the Court.

Ciesla testified that Classes 1, 2, and 4 accepted the Plan, with Class 3 rejecting. He then discussed the liquidation analysis which he helped prepare, saying that his analysis shows that

creditors will receive more under Chapter 11 liquidation than they would under Chapter 7.  His conservative scenario under a Chapter 7 analysis valued the liquidation proceeds at $382,600 and the proceeds under a Chapter 11 analysis at $4,527,000.  Ciesla said he had reduced the proceeds of the Pope sale received by the estate because of the risk that a Chapter 7 Trustee would not be able to track and ensure that all the payments were collected.  He also stated that he did not include the expected royalties from the Vivante sale or the proceeds from the Crucell sale in his Chapter 7 analysis.  He also testified that the Plan's requirement for the liquidating trust or debtor to pay administrative claims of $500,000 post-confirmation would actually decrease cash liquidity as opposed to increasing it.

As to the interrelatedness of Introgen and ITS at the time of filing, Ciesla testified that ITS' business exclusively related to the contract manufacturing and operations.  Ciesla explained that it would be difficult to separate the accounting of the two companies because ITS was in an infancy stage at the time of the two filings and was not conducting its own audits or normal required filings.  Ciesla stated that there was probably some comingling of assets and intercompany accounts.  As to the purchase price allocation regarding the sale of assets to Vivante,  Ciesla stated that it would likely be timely and costly to separate what Vivante bought from who, and that he believed it would be more efficient to combine the two entities for purposes of the bankruptcy proceeding.

Ciesla said that the current status of the Debtor is that there are no employees, no business activity, and that all assets have been liquidated, except for the assets to be sold to Pope, which Ciesla believed would be closed by October 2009.[3]  Ciesla testified that he believed that

---

[3] The sale to Pope was approved by this Court on October 8, 2009.

the sale to Pope was the best option the estate had, and there was no reason a Chapter 7 Trustee would not go forward with the transaction if the case was converted.

Ciesla discussed the oversight board proposed in the Plan.  He testified that the makeup of the Board would include a member from the class of administrative claims, unsecured claims, and equity to make sure that Creditors' claims will be protected.  Ciesla testified that he expected to personally spend 20 hours per quarter, with employees spending an additional 20 hours per quarter, to monetize the assets.  This would be a continuing administrative expense of the case.

Ciesla testified that as of the date of the hearing, the Debtors had $750,000 in cash on hand and that in the short term, the Debtors expected to receive $105,000 by the end of October 2009, as the first installment from the Vivante sale, $1 million from the Pope sale, and a $15,000 tax refund.  Adding this to the cash on hand, approximately $1.9 million was expected to be available to the Debtors by the end of 2009.  Ciesla testified that this would be sufficient to pay the secured claims of $70,000 and the administrative claims of $500,000 in their entirety.  The $500,000 of administrative claims included professional fees through the date of trial and "additional projections," including taxes and trustee fees.  He testified that there were anticipated post-petition administrative fees of $730,000, which did not include the $500,000 in professional fees.  Ciesla said this $730,000 comes from Debtors' accounts payable and accruals, which he stated are dwindling as no new business expenses arise.  He stated that there was approximately $2.25 million of debt which had priority over the unsecured creditors, but that as long as no unforeseen expenses arose, he anticipated paying Class 1 and 2, but not the unsecured creditors, by the end of 2009.

Ciesla also discussed expected income in 2010.  He testified that the Debtors expected an 18-month freeze period before they would start receiving royalties from the Vivante sale, but

they expected to receive income "some time in 2010." The Debtors were unsure about the income stream from the Crucell sale, but Debtors were optimistic that they would receive some income in 2010 as well. He testified that they did not expect any income stream from the Pope sale in 2010, as he believed it would take three to four years for the trial process before FDA approval was received. As such, after initial distributions under the Plan, there would be a time delay in paying Class 3 creditors.

Ciesla also discussed the separation of the two Debtors. He testified that he had been filing separate monthly operating reports for each Debtor and that there were separate schedules of assets and liabilities which listed debts owed by one Debtor to the other. When asked about the source of difficulty separating the estates, Ciesla testified that he did not agree with the Debtors' methodology in creating the separate schedules and doubted the accuracy of those schedules. He stated he was unhappy with the delineation between the two entities made by the Debtors. He testified that while there was some separation in accounting for which assets were sold, it was still not entirely clear which Debtor had sold the asset prior to sale. He also testified as to the intercompany payables and the confusion these created as to the assets each entity had.

Ciesla was asked to break down the $500,000 composing the administrative claims. While doing so, he acknowledged many problems with the prior monthly operating reports as far as the allocation between pre- and post-confirmation administrative claims. He testified that there would be minimal taxes coming due. He then answered questions about a $150 million net operating loss on the books of Introgen. He testified that while he believed that it would be transferrable to the Liquidating Trust, it would only be usable to offset future taxes, of which he anticipated none.

On redirect, Ciesla testified that even if all of the revenue expected from the Pope sale were included in the Chapter 7 analysis, as well as revenue from the Moffett revenue stream, this would increase the value of the estate in Chapter 7 to approximately $1.5 million, which is still significantly less than the $4.5 million estimate under the Chapter 11 analysis. Ciesla also testified as to the difference between having him ensuring revenues were collected, versus a Chapter 7 Trustee. He stated that based on his experience, in order to maximize revenue, someone would need to focus on the estate for up to 17 years.

### PARTIES' CONTENTIONS

After the trial, several issues were taken under advisement. Parties were asked to brief the following issues: (1) whether there truly is an impaired accepting class; (2) whether the two Debtors can be joined together for substantive consolidation; and (3) whether the interest retained by Class 4 – Equity is a violation of the Absolute Priority Rule. Both sides submitted briefs in support of their positions. The Court will discuss each issue in turn.

A.    <u>Impaired Accepting Class</u>.

In order for a plan to be confirmed over the objections of a creditor, there must be at least one impaired class which accepts the Plan. 11 U.S.C. §§ 1129(a)(10) and 1129(b)(1). Creditor Wilson Sonsini has objected to the confirmation of the Plan on the grounds that there is no impaired accepting class. (Docs. 357 and 508.) Initially, Debtors claimed that Classes 1, 2, and 4 were impaired accepting classes (Doc. #492), but revised this in their post-confirmation brief to state only Class 1 is an impaired accepting class. (Doc. #509.) Class 1 consists entirely of General Electric Capital Corporation's ("GECC") allowed secured claim. As Debtors are only asserting that Class 1 is the impaired accepting class, as required to confirm the Plan over the

objection of the unsecured creditors, this Court will only analyze whether Class 1 is truly an impaired class for the purposes of a cramdown analysis.

Wilson Sonsini objects to Class 1 being considered impaired because they claim Class 1 "will be paid either in cash, in the full amount of the secured claim, or by a promissory note." (Doc. #508, p. 12.)  They assert that "[t]he Plan does not . . ., on its face, necessarily result in any impairment of [Class 1's] Allowed Secured Claim."  (*Id.*)

In Debtors' Post-Hearing Brief in Support of Confirmation, Debtors point to GECC's claim which stems from the Master Security Agreement between GECC and Introgen.  The Master Security Agreement states in part that

> If the Debtor is in default, the Secured Party, at its option, may declare any or all of the Indebtedness to be immediately due to and payable without demand or notice to Debtor or any Guarantor.  The accelerated obligations and liabilities shall bear interest…until paid in full at eighteen percent (18%) per annum. . . .

Debtors' Modified Plan does not permit default interest at the contract rate.  (Doc. #488, p. 12.)

The Plan calls for Class 1 to either be paid in full on the effective date *or* to be paid by a promissory note without interest.  Debtors contend that because Class 1 could be paid via a promissory note without interest, Class 1 would be impaired as the Plan would not "leave unaltered the legal, equitable, and contractual rights" of GECC.  11 U.S.C. § 1124(1).  While a promissory note would certainly leave Class 1 impaired, this Court disagrees with Creditors' assessment that because Class 1 *may* receive a promissory note which would make them an impaired class, they are therefore an impaired class.  A Debtor cannot create ambiguity in a plan and then state that this is an impairment.  This Court believes that a fair construction of the Plan would require analyzing the Plan as if GECC were paid in full on the effective date to determine if Class 1 is truly an impaired class.

Section 1124 provides two means of leaving a class unimpaired.  Prior to 1994, however, Section 1124 contained a third means.  Section 1124(3) provided:

> Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan -- (3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to -- (A) with respect to a claim, the allowed amount of such claim. . . .

11 U.S.C. § 1124(3) (repealed).  In other words, a creditor was deemed unimpaired if the Plan called for payment in full of the allowed amount of the claim on the effective date.  If Creditors' Plan were drafted prior to this section's repealment, Wilson Sonsini would have an excellent point.  However, the Bankruptcy Reform Act of 1994 deleted § 1124(3) in its entirety.  Pub. L. No. 103-394 (enacted Oct. 22, 1994, and effective in cases commenced on and after that date).  Congress made this change in response to a New Jersey Bankruptcy Court decision which held that a class of creditors was unimpaired even though they were denied the right to receive post-petition interest because they were paid in full on the effective date of the plan.  *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994).  In making this change, the House Committee explained:

> In a recent Bankruptcy Court decision (*New Valley*), unsecured creditors were denied the right to receive post petition interest. . . .  In order to preclude this unfair result in the future, the Committee finds it appropriate to delete section 1124(3) from the Bankruptcy Code. As a result of this change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired, entitling creditors to vote for or against the plan of reorganization.

H.R. Rep. No. 103-835, at 47-48 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3356-57.

While there appears to be no relevant Fifth Circuit cases discussing the effect of the deletion of § 1124(3), it appears clear from the legislative intent and case law from across the country that Class 1, through the Plan's modification of GECC's contract rights and not allowing

for post-petition interest, is truly an impaired class.  *See Solow v. PPI Enters. (In re PPI Enters.)*, 324 F.3d 197, 205-07 (3d Cir. 2003) (agreeing with the Bankruptcy Court's determination that Congress intended that to be unimpaired, the claim must receive post-petition interest in *In re PPI Enter., Inc.*, 228 B.R. 339, 352 (Bankr. D. Del. 1998)); *In re Atlanta-Stewart Partners*, 193 B.R. 79, 80-82 (Bankr. N.D. Ga. 1996).

B.      Substantive Consolidation.

The next objection to confirmation raised by creditors was the propriety of Debtors' substantive consolidation of the two bankruptcy cases.  Creditor Wilson Sonsini objects to the Plan because it has been solicited as if the two Debtors were substantively consolidated. "Substantive consolidation" is defined as "[t]he merger of two or more bankruptcy cases, usually pending against the same debtor or related debtors, into one estate for purposes of distributing the assets, usually resulting in the two estates sharing assets and liabilities, and in the extinguishment of duplicate claims and claims between the debtors."  BLACK'S LAW DICTIONARY 351, 9th Ed. 2009.  The Fifth Circuit has said that "[f]undamentally, substantive consolidation occurs when the assets and liabilities of separate and distinct legal entities are combined in a single pool and treated as if they belong to one entity."  *Clyde Bergemann, Inc. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.)*, 250 F.3d 955, 959 (5th Cir. 2001) (quoting 1 William L. Norton Jr., Norton Bankruptcy Law and Practice § 20:3 (2d ed. 2000)).

Wilson Sonsini has pointed to two cases, one of which is a Fifth Circuit decision, which stand for the proposition that substantive consolidation is a remedy to be used sparingly.  *In re Amco Ins.*, 444 F.3d 690, 696-97 (5th Cir. 2006); *In re Owens Corning*, 419 F.3d 195, 208-09 (3rd Cir. 2005).  This is an accurate portrayal of the law, and there have been more recent cases in this circuit stating that substantive consolidation is "an extreme and unusual remedy."  *Bank*

*of New York Trust Co., NA v. Official Unsecured Creditors' Comm.* (*In re Pacific Lumber Co.*), 584 F.3d 229, 249 (5th Cir. 2009). However, the Fifth Circuit has acknowledged that bankruptcy courts do have the authority to order substantive consolidation. *In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 516 (Bankr. W.D. Tex. 2000) (citing *S.I. Acquisition, Inc. v. Eastway Delivery Serv. Inc.* (*In re S.I. Acquisition Inc.*), 817 F.2d 1142, 1145 n.2 (5th Cir. 1987)). This power has been determined to come from Section 105(a), which states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *In re Permian Producers*, 263 B.R. at 515 (quoting 11 U.S.C. § 105(a)). The Supreme Court has even recognized that consolidation of different but related estates is a vital tool in fulfilling a fundamental purpose of bankruptcy. *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219 (1941). So while it may still be seen as an extreme remedy, it is certainly within the power of this Court to order substantive consolidation.[4]

While allowing for substantive consolidation, the Fifth Circuit has not adopted its own criteria for determining when it is appropriate. *In re Coleman*, 417 B.R. 712, 726 (Bankr. S.D. Miss. 2009). There is no universally accepted standard for substantive consolidation and it has been said to be a highly fact-specific analysis made on a case-by-case basis. *In re Permian Producers*, 263 B.R. at 517. That being said, there have been two distinct types of tests to develop – a more traditional, factor based test and a balancing test. Under the traditional test, courts look to several factors in determining whether substantive consolidation is appropriate. *In re E'Lite Eyewear Holding, Inc.*, 2009 Bankr. LEXIS 297, 8 (Bankr. E.D. Tex. Feb. 5, 2009) (discussing *In re Permian Producers*, 263 B.R. at 517). Other courts have also applied a

---

[4] For a good discourse on the history of substantive consolidation in America, see *In re Owens Corning*, 419 F.3d at 205-209 (3rd Cir. 2005).

balancing test, focusing on the impact of consolidating the creditors and weighing it against the benefits of consolidation. *In re Permian Producers*, 263 B.R. at 518.

Before beginning this inquiry into the appropriateness of ordering substantive consolidation, the Court offers a few words on the evidentiary burden placed on the proponent of substantive consolidation. No Fifth Circuit case has discussed the burden required. The most on point case the Court is aware of, and cited by the Debtors, discussed in a footnote that "it appears that a preponderance of the evidence would be sufficient." *In re Affiliated Foods, Inc.*, 249 B.R. 770, 775 n.5 (Bankr. W.D. Mo. 2000). This Court agrees with the Debtors, and holds the evidentiary standard required to be shown by the Debtors will be a preponderance of the evidence standard.

1.      The Traditional Test

Looking first at the traditional test, courts have considered many different factors, most commonly looking at: (1) the degree of difficulty in segregating and ascertaining individual assets and liability; (2) the presence or absence of consolidated financial statements; (3) the profitability of consolidation at a single physical location; (4) the commingling of assets and business functions; (5) the unity of interests and ownership between the various corporate entities; (6) the existence of parent and inter-corporate guarantees on loans; and (7) the transfer of assets without formal observance of corporate formalities. *In re Permian Producers*, 263 B.R. at 518 (citing *In re Vecco Constr. Indus., Inc.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980)); *see also In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992); *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (articulating principles courts should consider when engaging in substantive consolidation analysis). The Second Circuit distilled the many factors courts have considered into two critical factors: "(i) whether creditors

dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit…; or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 519 (2d Cir. 1988). [5] The presence of either factor is sufficient to order substantive consolidation, but in the present case, this Court finds both factors to be present. *See In re E'Lite*, 2009 Bankr. LEXIS 297, 9 (citing *In re Augie/Restivo*). This court believes that the two *Augie/Restivo* factors accurately reflect the criteria courts should look at in deciding whether substantive consolidation is appropriate, and as such, will analyze the facts accordingly.

In the Post-Petition Brief filed by Debtors, Debtors correctly enumerated the factors at issue and went through them in support of determining that substantive consolidation is correct. (Doc. #509, p. 12-19.) As for the first *Augie/Restivo* factor, whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, it appears that creditors did deal with Introgen and ITS as a single economic unit, without relying on their separate identity, in extending credit. Debtors point to the fact that there is only one secured creditor in the case from a loan agreement which began in 2003, five years before ITS was formed. Debtors also give many examples of how the unsecured creditors dealt with the Debtors as a single economic unit and that untangling which creditors should pertain to which Debtor would be both time consuming and ultimately wasteful. (*See* Doc. #509, pp. 14-16.) This Court finds their examples convincing to establish that creditors were treating the entities as a single economic unit and did not rely on their separate identity in extending credit, as many creditors with claims against ITS had sent bills to Introgen, or similarly named companies.

---

[5] *C.f. In re Permian Producers*, 263 B.R. at 518. The court in that case discusses the factors from *In re Augie/Restivo* as formulating a simplified version of the balancing test. This Court believes that while similar to a balancing test, *In re Augie/Restivo* distills the factors from the traditional test into two primary factors. The balancing test for substantive consolidation will be discussed separately below.

According to *Augie/Restivo*, the second factor is concerned with the entanglement of the debtors' affairs and involves cases where there has been commingling of the two debtors' assets and business functions.  860 F.2d at 519.  The standard to determine if substantive consolidation is appropriate in this type of situation is to determine "that all creditors will benefit because untangling is either impossible or so costly as to consume the assets."  *Id.*  Commingling can justify substantive consolidation "only where the time and expense necessary even to attempt to unscramble them is so substantial as to threaten the realization of any net assets for all the creditors, or where no accurate identification and allocation of assets is at all possible."  *Id.*  In these situations, according to the Second Circuit, all creditors are better off with substantive consolidation.  *Id.*  Based on the unrefuted testimony of Ciesla, there are some intercompany accounts and comingling, and it would not necessarily be easy to separate the accounting of the two debtors.

According to Debtors' Post Hearing Brief and information taken from Introgen's Monthly Operating Reports, Introgen owned 100% of the outstanding common stock of ITS, had given ITS $1,000,000 of initial capital, and had loaned ITS an additional $3,386,581 through cash and assumption of operating liabilities.  (Doc. #509, p. 17.)  Ciesla described ITS as being in its infancy stage at the time of the two filings.  This all weighs heavily in favor of finding that there was significant commingling of assets.  Debtors' Post Hearing Brief also discusses the asset sales to Crucell, Vivante, and Pope and the difficulty in disentangling the ownership of the assets sold, as well as determining which entity benefitted from the services related to the claims of the creditors.  (Doc. #509, pp. 17-18.)  Ciesla also testified that he believed it would likely be timely and costly to separate what Vivante bought from which of the two Debtors.  Based on the above discussion and testimony, it is apparent that it would be timely and costly to attempt to

unscramble the assets and liabilities of the two debtors. As such, this Court finds that all creditors will indeed benefit from substantive consolidation in avoiding the time and cost necessary to fully separate the accounts of the two debtors.

Despite substantive consolidation being warranted if *either* of the two ***Augie/Restivo*** factors are present, this Court has determined that both factors are met and that the traditional, factor-based test supports ordering substantive consolidation.

    2.   <u>The Balancing Test</u>

Turning now to the balancing test – in order to convince a court of the propriety of ordering substantive consolidation, the party proposing consolidation must first show identity between the entities to be consolidated, and then show that consolidation is necessary in order to prevent harm or prejudice, or to effect a benefit generally. ***In re Permian Producers***, 263 B.R. at 518 (quoting ***In re Snider Bros.***, 18 B.R. 230 (Bankr. D. Mass. 1982)). At this point, a creditor could object and defeat any proposed consolidation by showing that it relied on the separateness of the debtors in extending credit and would thereby suffer harm by consolidation. *Id.* Then, if the benefits outweigh the harm, the court will order substantive consolidation. *Id.*

As discussed at length above, Debtors have demonstrated identity between the two entities at issue and have shown the necessity of substantive consolidation. As Ciesla's testimony was undisputed and no creditors offered any testimony of their own to counter Ciesla's assertions, there has been no creditor showing a reliance on the separateness of the Debtors or any harm they will suffer by consolidation. What remains to be determined is whether the potential benefits would in fact outweigh the harms of substantive consolidation.

Potential harm of substantive consolidation are most prevalent when one of the debtors has no secured creditors, and the unsecured creditors would therefore be put further back in line

if that debtor were to be substantively consolidated with a debtor with significant secured debts. Allowing those unsecured creditors to be paid before the unsecured creditors of the related debtor with large amounts of unsecured debt would also seem unjust.  In the case at bar, unsecured creditors of ITS would potentially be harmed by substantive consolidation because their claims would then fall behind the secured claims in the Introgen case.[6]  Creditors of Introgen, though, would appear to be harmed by allowing ITS' unsecured creditors to be paid before Introgen's unsecured creditors.  As counsel for the Debtors have pointed out, however, no evidence was presented of any harm to creditors if substantive consolidation were ordered.  As such, Debtors have met their evidentiary burden and the balancing test falls on the side of determining that substantive consolidation is appropriate.

Both the traditional factor-based test and the balancing test weigh in favor of determining that substantive consolidation in the present case is appropriate.  This Court therefore holds that the Debtors will be substantively consolidated for purposes of confirming their Plan.

C.      The Absolute Priority Rule.

Creditors assert that Debtors' Plan violates § 1129(b)(2)(B)(ii), commonly referred to as "The Absolute Priority Rule," in two separate ways.  As discussed above, the Plan calls for Class 4 – Equity to receive a pro rata share of any remaining cash distributions from the Liquidating Trust solely to the extent that all interest holders in Classes 1, 2, and 3 have been paid in full. Creditors assert that this retained interest is property retained on account of their equity interest. Alternatively, Creditors claim the proposed seat on the Liquidating Trust Board to be retained by Class 4 – Equity is property in violation of the absolute priority rule.  Debtors additionally assert that Class 3 *will* be paid in full in satisfaction of § 1129(b)(2)(B)(i), meaning absolute priority

---

[6] As discussed above, ITS has no secured creditors, so the unsecured creditors would be first in line after all priority claims are paid.

rule issues should not be reached.  While persuasive, this Court has still chosen to analyze the issue as if Class 3 is not paid in full.

### 1.    Remaining Funds in the Liquidating Trust

Creditors correctly assert that preserving property on account of a claim junior to an objecting class is a violation of the absolute priority rule.  § 1129(b)(2)(B)(ii).  However, Creditors question whether the right to receive a contingent interest in a liquidating trust, when the contingency is "payment in full of all senior classes," is really property.  Briefs on both sides of the argument cite many cases discussing the nature of property and that property has been determined to be virtually anything of value, no matter how contingent or doubtful.  Recitation of these cases seems unnecessary and an appeal to common sense will reach the correct answer here.

Class 3 Creditors appear to be trying to have it both ways.  Either they will ultimately receive adequate property to satisfy their claims as contemplated in the Plan, or this property does not now, and will never exist.[7]  The right to receive something imaginary is not property.  The only way Class 4 will receive anything is if Class 3 in fact gets paid *in full*, in satisfaction of § 1129(b)(2)(B)(i), meaning the absolute priority rule would not be an issue.  If Class 3 is not paid in full, Class 4's "property interest" is not just valueless, as Creditors argue, it simply does not exist.

### 2.    The Seat on the Liquidating Trust Board

Creditors also assert that the right to the seat on the Liquidating Trust Board should also be considered a property interest.  The Supreme Court has stated that, even in the context of an insolvent business, "[w]hether the value is 'present or prospective, for dividends or only for

---

[7] And Class 4 will ultimately receive nothing.

purposes of control' a retained equity interest is a property interest" for purposes of the absolute priority rule. ***Norwest Bank Worthington v. Ahlers***, 485 U.S. 197, 207-08 (1988). The Court continued, stating that "even in a sole proprietorship, where 'going concern' value may be minimal, there may still be some value in the control of the enterprise." ***Ahlers***, 485 U.S. at 208.

The Tenth Circuit relied on this in determining that a debtor's retention of control precluded compliance with the absolute priority rule. ***Unruh v. Rushville State Bank***, 987 F.2d 1506, 1509 (10th Cir. 1993). Other courts have similarly held that "there is 'value' in the retention by the equity security holder of *control* of the reorganized company." ***In re Genesee Cement, Inc.***, 31 B.R. 442, 444 (Bankr. E.D. Mich. 1983) (emphasis in original). Similarly, in ***In re Pecht***, a debtor sought to retain his sole proprietorship interest without satisfying unsecured claims in full. 53 B.R. 768 (Bankr. E.D. Va. 1985). The court in that case noted that the "fact that the interest may, in a net worth sense, be worthless does not mean that there is no value or property retained. . . . It is the control of the reorganized entity which is a valuable asset. . . ." *Id.* at 772. Other courts have held that even indirect control may qualify as a prohibited property interest. A court denied confirmation where two debtor shareholders, who were brothers, proposed a plan to transfer the debtor's corporate assets to a new corporation controlled by their parents, concluding that the plan indirectly allowed the debtor's stockholders to retain control of the corporate assets. ***In re Perdido Motel Group, Inc.***, 101 B.R. 289, 291-92 (Bankr. N.D. Ala. 1989).

An Illinois bankruptcy court similarly held, in relying on ***Ahlers***, that "the power to control a corporation, through its board of directors, that a majority shareholder has, is a separate property interest, distinct from the value of the shares themselves." ***In re 4 C Solutions, Inc.***, 302 B.R. 592, 597-98 (Bankr. C.D. Ill. 2003). In that case, the court refused to confirm a plan

that provided stock to a majority shareholder of the debtor's holding company, who had exercised control over the debtor derivatively through his ability to control debtor's board of directors by way of his control of the holding company.  *Id.* at 598.

What this line of cases explicitly provides is that control over a company will be considered a property interest for purposes of determining if there is a violation of the absolute priority rule.  What these cases do *not* establish, is what exactly "control" is.  Black's Law Dictionary defines "control" as "[t]he direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee." BLACK'S LAW DICTIONARY 378, 9th Ed. 2009.  Additionally, "controlling interest" is defined as "[s]ufficient ownership of stock in a company to control policy and management; esp., a greater-than-50% ownership interest in an enterprise." *Id.* at 885.

Debtors' Plan is a liquidating plan.  All significant assets have been sold at this point. The Plan establishes a liquidating trust in order to oversee the distributions of the assets and residual income streams from the sale of the assets.  The Plan also establishes a Liquidating Trust Board consisting of one allowed priority claimant, one allowed unsecured claimant, and one allowed equity interest holder.  The Board shall have the right to approve or disapprove of proposed material transactions by the Liquidating Trust.  Additionally, the Trust cannot consummate or implement any sale involving Liquidating Trust Assets unless and until the Court authorizes and approves such sale.  The Liquidating Trustee is also required to provide notice of and the opportunity for a hearing on all motions to sell assets to all entities who have requested notice.  In other words, the power of the Board of Directors is to either approve or disapprove of a material transaction proposed by the Liquidating Trustee, which proposed transaction must

then be approved by the Bankruptcy Court after the opportunity for a hearing.  The Plan provides

for allowing a member of Class 4 equity to have one of three seats on a Board that is overseen by

a Trustee whose power to make any changes is subject to approval by the Bankruptcy Court.

Comparing the power to be granted to Class 4 to the definition of "control" and the types of

control contemplated in the cases cited above, it appears the proposed seat on the Liquidating

Trust Board is so far removed from control that it could not be considered property in violation

of the absolute priority rule.[8]

Creditors have objected to the Plan on the grounds that it violates the absolute priority

rule because of the payout to Class 4, should there be money leftover in the Liquidating Trust

after Class 3 has been paid, and because the Plan provides for Class 4 to have a seat on the Board

of the Liquidating Trust.  This court has determined that neither of these complaints are valid

violations of the absolute priority rule and do not pose an obstacle to plan confirmation.

### CONCLUSION

After a courtroom proceeding, Debtors and Creditors submitted briefs on three main

points of contention concerning the approval of Debtors' Plan of Reorganization.  Having gone

through the facts of the case and considered the briefs of the parties, this Court finds that (1)

Debtors' Plan of Reorganization contains an impaired accepting class as required under

§§ 1129(a)(10) and 1129(b)(1); (2) substantive consolidation of Introgen and ITS is warranted;

and (3) the Plan does not violate the absolute priority rule of § 1129(b)(2)(B)(ii).  For these

reasons, the Plan is CONFIRMED.

---

[8] Additionally, the cases discussed above contemplate equity retaining control over the reorganized debtor, which is
distinguishable from control over a liquidating trust.

Further, given that the Court has confirmed Debtors' plan, the United States Trustee's motion to convert is DENIED. A separate order denying the U.S. Trustee's Motion to Convert the Case to Chapter 7 Or, In The Alternative, Appoint a Chapter 11 Trustee, will be entered.

# # #